E-FILED
Monday, 27 July, 2026 03:31:51 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| ADRIANE MOEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-04047-SLD-RLH |
| | ) | |
| JOHN WOOLRIDGE, | ) | |
| | ) | |
| Defendant. | ) | |

<u>ORDER</u>

Before the Court is Plaintiff Adriane Moen's motion for default judgment, ECF No. 16.

For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

Defendant John Woolridge is liable for sex trafficking under the Trafficking Victims Protection

Reauthorization Act ("TVPRA"), which creates a civil cause of action for violations of Chapter

77, *see* 18 U.S.C. § 1595, and the Illinois Trafficking Victims Protection Act ("ITVPA"), 740

ILCS 128/1–99.  As such, the Court awards Moen $169,500.00 in gross revenue damages,

$24,636.00 in economic compensatory damages, and $19,501,907.00 in non-economic

compensatory damages, plus prejudgment interest of $1,677,131.55.  The Court also awards

Moen $29,289,814.50 in punitive damages and finds she is entitled to attorneys' fees and costs,

including the costs of expert and witness testimony.  Moen is also entitled to post-judgment

interest at a rate of 4.10 percent from the date of judgment until the award is paid in full.

**BACKGROUND**[1]

## I.    Facts of the Case

Woolridge and Moen first met on a dating app in 2012.  At the time, Moen lived in the Quad Cities area and Woolridge lived in Chicago.  They exchanged messages on the app before transitioning to directly talking and texting via phone.  Moen and Woolridge messaged and spoke with each other daily.  She began to believe they were in a romantic relationship.  Around September 2012, after they had been talking for six or seven months, Woolridge asked to meet Moen in person and she agreed.  Once they met in person, their communication continued.  Moen disclosed deeply personal information to Woolridge, including her struggles with homelessness, single parenthood, unemployment, and the loss of her mother.  Around October 2012, Moen and Woolridge again met in person.  At that point, Moen considered Woolridge her boyfriend.  They began to see each other more frequently and continued their communication when apart.

Also in October 2012, Woolridge, knowing Moen was struggling financially, suggested she join Backpage.com ("Backpage").  Backpage was the internet's leading forum for prostitution advertisements until its government-enforced shutdown in 2018.  Moen had never heard of Backpage, but Woolridge knew its purpose.  Moen felt unsure about joining the site, but Woolridge pressured her into prostitution, promising both that it would resolve her financial strains and that he would protect her.  He told her that they were a team.  As a result, Moen grew hopeful that engaging in the commercial sexual activity Woolridge proposed would help her escape homelessness and poverty, and she allowed Woolridge to create a Backpage account for her.  He took photos of her and created and posted an advertisement on Backpage around

---

[1] The facts related herein are taken from the complaint, ECF No. 1, which the Court accepts as true by virtue of Woolridge's default.  *See Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012).

October 2012. When he posted this advertisement, he knew that it would lead to commercial sexual acts and intended to solicit such conduct. Woolridge initially solicited sex in the Quad Cities area because that was where Moen lived. He also gave Moen a Google Voice phone number and instructed her on how to speak to callers and ensure that they were not law enforcement. He set her price at a $100.00 minimum per encounter.

Within weeks of Woolridge's uploading the advertisement, Moen was receiving calls for commercial sex from men who found her through the Backpage advertisement. Moen followed Woolridge's directions, going on "dates" and performing commercial sexual acts. Immediately, Woolridge demanded thirty percent of all of Moen's earnings. Woolridge and Moen continued what she believed to be a romantic relationship; however, Woolridge forced her to give him her cash every time they were together and, if they were apart, he would order her to transfer her money onto a prepaid debit card for his use.

Shortly after commencing the commercial sexual activities, Moen informed Woolridge that she wanted to stop. He became hostile and abusive, telling her that he was a powerful man. He threatened that his power was currently protecting her, but that, if he so chose, it could hurt her instead. And so Moen continued engaging in commercial sexual activities and paying Woolridge a percentage of her earnings. For three years, Moen was forced to engage in ten to twelve commercial sexual encounters per day, seeing an estimated fifty to seventy men per week. Moen often met these men in hotels, and she had to do whatever these men asked. Moen suffered "rape, degradation, robbery and constant fear of [Woolridge], other pimps, police, and serial killers." Compl. ¶ 28, ECF No. 1.

Woolridge pushed Moen to see more men and began directing her to travel to the men. When calls lessened in the Quad Cities area, Woolridge posted the advertisements to Chicago

and its surrounding suburbs.  Woolridge would book hotel rooms and wait for clients in the hotel lobbies with Moen.  While waiting, Woolridge berated and belittled her.  He also brought Moen to other cities, where he would post Backpage advertisements.  These cities included, among others, Pittsburgh, Cincinnati, Indianapolis, and Atlanta.  The trips were always financially beneficial for Woolridge and for the purpose of engaging in commercial sexual acts.  Moen stayed in each city for a few days, answering calls and engaging in commercial sexual activity all day, each day.  Moen would give a portion of her earnings to Woolridge.  At this point, she realized Woolridge was monitoring her Google Voice and email accounts.  If he was not paid for an encounter, he forced her to pay him.

Once, in Pittsburgh, Moen and Woolridge fought.  He left her stranded in Pittsburgh with no money and blocked her calls.  Moen was forced to engage in more commercial sexual acts to pay for her travel home.  Another time, Moen and Woolridge were driving from Pittsburgh and Indianapolis.  While traveling, Woolridge punched her in the eye, detaching her retina.  She eventually underwent surgery to repair this injury.

Woolridge's physical violence and abusive conduct continued to escalate.  Beginning in 2013, Woolridge often beat the back of Moen's head for "not making enough money."  *Id.* ¶ 35 (quotation marks omitted).  He would regularly tell her that "his other girls" made more money and that Moen did not deserve his presence.  *Id.*  Woolridge consistently verbally abused Moen, isolated her from friends and family, and forced her to share access to her PayPal account, from which he monitored her payment activities.  Drunk, high, or with pills in hand, Woolridge often appeared at the hotels where Moen stayed.  He regularly carried a gun.  Moen felt scared and trapped.  In 2013 and 2014, she was arrested for prostitution.  By 2015, Woolridge was demanding sixty percent of Moen's earnings.  At the same time Woolridge coerced Moen into

commercial sexual activity for his financial gain, he was doing the same with an estimated five other women.

Moen tried to escape Woolridge multiple times. Her attempts failed because of his violence, threats, and manipulation. In early 2015, Moen successfully escaped from Woolridge and went to live with her father in Moline, Illinois. By then, Moen had given Woolridge over $420,000.00 of her earnings. Woolridge demanded more money from her and, when Moen refused, he became angry and demanded $5,000.00. Moen again refused. In November 2015, Woolridge threatened to distribute links to sexually explicit videos of Moen if she did not send the $5,000.00. Moen continued to refuse and Woolridge retaliated, posting over fifteen stolen nude photographs and videos of Moen engaging in sexual acts. He also posted her photos to the Facebook page "Quad City THOTs" and created another Facebook page called "[Moen's minor child's name] Needs a Mommy." Woolridge created a Craigslist advertisement and a Twitter page, both of which included links to pornography sites featuring stolen videos of Moen engaging in sexual acts. Woolridge also posted the videos to Pornhub.

All of the physical, emotional, and financial abuse caused Moen to struggle with post-traumatic stress disorder ("PTSD"). Moen did not understand she was a victim of sex trafficking until 2020, when she began counseling. Since then, Moen has become an advocate for anti-trafficking efforts. As part of this work, she visited the White House and testified before the United States Department of Health and Human Services about her experiences.

## II.     Procedural History

Moen filed her complaint against Woolridge on February 24, 2025. She brings two claims: direct liability for sex trafficking in violation of the TVPRA (Count I) and sex trafficking in violation of the ITVPA (Count II). Under Federal Rule of Civil Procedure 4(c)(2), Moen

5

could not directly serve Woolridge, so this Court directed her to serve him both via private Instagram direct message and via email.  *See* May 9, 2025 Order 7, ECF No. 10.  On June 17, 2025, after serving Woolridge in accordance with the Court's order, *see* Ghadiri Aff., ECF No. 11; Payne Aff., ECF No. 12, Moen moved for entry of default under Federal Rule of Civil Procedure 55(a), *see* Mot. for Entry of Default, ECF No. 13.  On June 18, 2025, Magistrate Judge Ronald L. Hanna granted entry of default.  June 18, 2025 Text Order.  On September 10, 2025, Moen filed her motion for default judgment, Mot. Default J., and supporting memorandum, Mem. Supp. Mot. Default J., ECF No. 17.  To date, Woolridge has not appeared in this case.

## DISCUSSION

### I.     Legal Standard

A court may enter judgment against a defaulted party under Federal Rule of Civil Procedure 55(b)(2).  "A default judgment establishes, as a matter of law, that [a] defendant[] [is] liable to [a] plaintiff on each cause of action alleged in the complaint."  *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007).  After default is entered, "the well-pleaded allegations of a complaint relating to liability are taken as true."  *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983).  However, allegations as to the amount of damages are not.  *Id.*  A court must conduct a hearing on damages unless "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits."  *Id.*

### II.    Analysis

The Court will first consider whether Moen's allegations have established Woolridge's liability under each count.  Then the Court will determine what relief is appropriate.

6

### a. Liability

### i. Count I - Trafficking Victims Protection Reauthorization Act

The Court finds that Moen's complaint has established Woolridge's liability for Count I. Moen, alleging direct liability,[2] seeks relief under 18 U.S.C. § 1595(a), which creates a civil cause of action for victims of the criminal statute prohibiting sex trafficking of children or by force, fraud, or coercion, 18 U.S.C. § 1591. Under § 1591, a plaintiff must prove that the defendant knowingly "in or affecting interstate . . . commerce, . . . recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed] by any means a person" for commercial sex acts. *Id.* § 1591 (a)(1); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 551–53 (7th Cir. 2023). The defendant must also either know or recklessly disregard the fact that (1) the plaintiff was a minor at the time or (2) the plaintiff's engagement in commercial sexual acts occurred as a result of "means of force, threats of force, fraud, [or] coercion." 18 U.S.C. § 1591(a); *see also United States v. Biancofiori*, 94 F.4th 651, 653 (7th Cir. 2024) ("[T]rafficking through force . . . suffices."). Moen's complaint sufficiently alleges that Woolridge knowingly recruited, enticed, transported, provided, and advertised her for commercial sexual acts across several states by force. As such, Woolridge is directly liable to Moen under the TVPRA for sex trafficking.

---

[2] Moen appears to use "direct liability" to refer to what other cases call "perpetrator liability." The TVPRA provides for two types of liability: perpetrator and participant. Perpetrator liability holds accountable individuals who knowingly "recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[ed], maintain[ed], patronize[d], or solicit[ed]" someone in any way. 18 U.S.C. § 1591(a)(1). Participant liability holds accountable entities which "benefit[ed], financially or by receiving anything of value, from participation in a venture which has engaged in an act described" by 1591(a)(1). *Id.* § 1591(a)(2). In other words, perpetrator liability holds direct actors accountable while participant liability primarily targets entities which enabled perpetrators' conduct. *See, e.g.*, *G.G. v. Salesforce.com, Inc.*, 76 F,4th 544, 552–53 (7th Cir. 2023) (distinguishing between the plaintiff's street-level trafficker's perpetrator liability under § 1591(a)(1) and Salesforce's potential participant liability under 1591(a)(2)).

### ii.  Count II - Illinois Trafficking Victims Protection Act

The Court finds that Moen's complaint has established Woolridge's liability for Count II. The ITVPA creates a cause of action for "victim[s] of the sex trade, involuntary servitude, or human trafficking."  740 ILCS 128/15(a).  This action may be brought "against a person or entity who: (1) recruits, profits from, or maintains the victim in any sex trade act; (2) intentionally abuses . . . or causes bodily harm . . . to a victim of the sex trade; or (3) knowingly advertises or publishes advertisements for the purposes of recruitment into sex trade activity." *Id.* 128/15(b). Moen's complaint clearly establishes that Moen is a victim of the sex trade and that Woolridge recruited, profited from, and maintained her in sex trade acts.  As such, Woolridge is liable to Moen for sex trafficking in violation of the ITVPA.

### b.  Awards

The Court finds it unnecessary to hold a hearing on damages because Moen has requested specific amounts and has submitted documentary evidence and declarations[3] in support of her requests.  The amount of damages due is "capable of ascertainment" from this evidence.  *See Dundee Cement*, 722 F.2d at 1323.  Thus, the only task remaining for the Court is to determine whether the requested relief is supported by the evidence.  *See e360 Insight*, 500 F.3d at 602.

Moen provides detailed award requests under both the TVPRA and the ITVPA, *see* Mem. Supp. Mot. Default J. 9–31, but she acknowledges that the Court may only grant an award under one and requests the Court award her the greater amount, *id.* at 21 n.5; *Gen. Tel. Co. of the Nw. v. E.E.O.C.*, 446 U.S. 318, 333 (1980) ("[C]ourts can and should preclude double recovery by an individual.").  Under the ITVPA, a victim "shall be entitled to all relief that would make . . . her

---

[3] Although Moen submitted a declaration and not an affidavit, the declaration is signed under the penalty of perjury. Moen Decl. 1, Mem. Supp. Mot. Default J. Ex. B, ECF No. 17-2.  As such, the Court finds that the declaration is sufficiently reliable such that a hearing would be unnecessary, as if she had instead filed affidavits.  *See* 28 U.S.C. § 1746.

whole," including—but not limited to—(1) declaratory relief; (2) injunctive relief; (3) attorneys' fees and costs, including costs of expert testimony and witness fees; (4) compensatory damages such as economic loss, loss of past or future earnings, and damages for personal injury, disease, and mental and emotional harm; (5) punitive damages; and (6) "damages in the amount of the gross revenues received by the defendant from, or related to, the sex trade." 740 ILCS 128/20. In addition to any other civil penalties authorized by law, the TVPRA requires courts to award the "full amount of the victim's losses" as well as the greater of either the value to the defendant of the victim's work or the value of victim's labor under minimum wage. 18 U.S.C. § 1593(a)–(b); *see A.A. v. Omnicom Grp., Inc.*, No. 25-CV-3389 (JMF), 2026 WL 504904, at *21 (S.D.N.Y. Feb. 24, 2026) (collecting cases and concluding that the court "joins every other court that has considered the issue in concluding that restitution is available in civil actions under the TVPRA."). The full amount of the victim's losses "includes any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim." 18 U.S.C. § 2259(c)(2); *see id.* § 1593(b)(3) (incorporating the definitions provided in § 2259(c)(2)). Both the TVPRA and ITVPA utilize non-exclusive language, highlighting that the awards categories explicitly outlined in the statutes are not the only categories from which a victim may recover. *See* 740 ILCS 128/20 (noting that a victim is entitled to "all relief that would make . . . her whole," which "includes, but is not limited to" the outlined categories); 18 U.S.C. § 2259(c)(2)(F) (allowing victims to recover "any other relevant losses [they] incurred"). Moen's requested amount of economic compensatory damages, punitive damages ratio, and pre- and post-judgment interest are the same for ITVPA and TVPRA. Mem. Supp. Mot. Default J. 31. However, she requests over $6 million more in non-

9

economic compensatory damages under the ITVPA than the TVPRA and also requests costs for expert testimony and witness fees under only the ITVPA.  *Id.*

Because of the statutory similarities between the ITVPA and TVPRA, Woolridge's liability under both, and Moen's request for a higher total damages amount under her ITVPA count, the Court will only discuss the damages to which Moen is entitled under the ITVPA.[4]  *See* 740 ILCS 128/40 ("Any person who recovers damages under this Act may not recover the same costs or damages under any other Act.").  Moen requests (1) compensatory damages, "including economic loss damages and mental and emotional harm," Mem. Supp. Mot. Default J. 21; (2) punitive damages; (3) "damages in the amount of the gross revenues received by [Woolridge] from or related to the sex trade," *id.*; (4) the costs and fees of experts, witnesses, and attorneys, *id.* at 30; and (5) pre- and post-judgment interest, *id.* at 31.  Although she requests declaratory or injunctive relief in her complaint, *see* Compl. 11, she makes no mention of it in any of her default judgment filings, *see generally* Mot. Default J.; *see also* Mem. Supp. Mot. Default J.  As such, the Court presumes Moen no longer seeks declaratory or injunctive relief.  The Court now turns to her requests for (i) gross revenue damages[5]; (ii) economic and non-economic compensatory damages; (iii) punitive damages; (iv) attorneys, witness, and expert fees and costs; and (v) pre- and post-judgment interest.

---

[4] Although the Court makes a few reductions to Moen's requested ITVPA award, these reductions do not require the Court to also consider damages under the TVPRA.  The Court only makes three reductions to Moen's request.  First, the Court removes duplicative categories of non-economic compensatory damages; however, even after this reduction, the total non-economic compensatory damages requested under the ITVPA is higher than under the TVPRA.  *Compare infra* Section II(b)(ii)(2)(b), *and* Mem. Supp. Mot. Default J. 31 (requesting $18.82 million in non-economic compensatory damages under the TVPRA).  Second, the Court declines to award an economic compensatory damages category that is insufficiently supported by the evidence, an error equally fatal under both the ITVPA and the TVPRA.  And finally, the Court makes reductions to Moen's punitive damages in order to comport with federal due process concerns.  Because the reduction comes not from Illinois law but from federal constitutional considerations, this reduction would likewise apply to the TVPRA.

[5] Moen discusses her request for gross revenue damages within the economic compensatory damages section, *see* Mem. Supp. Mot. Default J. 22–23, but the Court will address this category separately in accordance with the statutory scheme.

### i. Gross Revenue Damages

The ITVPA allows a prevailing victim of the sex trade to recover "damages in the amount of gross revenues received by the defendant from, or related to, the sex trade. . . of the plaintiff." 740 ILCS 128/20(6). Moen alleges that Woolridge forced her to engage in ten to twelve instances of commercial sexual activity per day, totaling between fifty and seventy instances per week. Compl. ¶ 28. This occurred over three years. *Id.* Moen also alleges that Woolridge initially demanded thirty percent of her earnings from commercial sexual activities, *id.* ¶ 24, and that by the time she escaped, he was keeping sixty percent of her earnings, *id.* ¶ 40. It is unclear how and when he increased the percentage of her earnings that he demanded. *See generally* Compl.

Moen argues that Woolridge received $474,600.00 in gross revenue from or related to the sex trade. Mem. Supp. Mot. Default J. 23. She calculated this number by multiplying the highest possible number of sexual acts (seventy per week) by the maximum percentage of Moen's earnings Woolridge ever kept (sixty percent) and not taxing his earnings. *See* Milbury Report 16, Mem. Supp. Mot. Default J. Ex. C, ECF No. 17-4.[6] It is appropriate to calculate gross revenue pre-tax because Illinois gross revenue awards generally do not subtract taxes or other overhead expenses from its calculations. *See, e.g.*, *Selected Furniture, LLC v. Georgia's Rest. & Pancake House, Inc.*, 2015 IL App (1st) 141794-U, 8 (Ill. App. Ct. 2015) (discussing not subtracting fixed overhead, including taxes, from the gross revenue amount).

As such, the Court will award Moen a pre-tax gross revenue amount. And because Moen has not provided particular details establishing exactly how many times per week she engaged in commercial sexual activities, nor what percentage Woolridge kept of her earnings at each stage,

---

[6] Due to inconsistent pagination, the Court cites to the PDF page numbers.

the Court exercises its discretion to calculate her gross revenue award using the lowest possible number of sexual acts (fifty per week) by the minimum percentage Woolridge kept of her earnings (thirty percent). In total, Moen is entitled to $169,500.00 in gross revenue damages. *See* Milbury Report 14.

### ii. Compensatory Damages

Moen requests $105,190.96 in economic compensatory damages and $25 million in non-economic compensatory damages. Mem. Supp. Mot. Default J. 22–25. The Court will first address her requested economic compensatory damages before turning to her non-economic compensatory damages.

### 1. Economic Compensatory Damages

A victim under ITVPA is entitled to economic compensation, including for "damage, destruction, or loss of use of personal property, [and] loss of past or future earning capacity." 740 ILCS 128/20(4)(A). Moen requests $24,636.00 for lost income and $64,050.96 for loss of future earning capacity. Mem. Supp. Mot. Default J. 23. She argues that she is entitled to past and future earning capacity, as well as gross revenue, because it is aligned with the statutory intent. *Id.* at 22–23. However, the Court need not consider legislative intent—the statute explicitly allows for loss of past and future earning capacities as economic compensatory damages, 740 ILCS 128/20(4)(A), *and* gross revenues received by Woolridge, *id.* 128/20(6). Moen is plainly entitled to lost income and loss of future earning capacity; therefore, the Court must only determine how much she may recover for each type of damages.

Because Moen earned minimum wage prior to being trafficked, she calculated her lost income by multiplying Illinois minimum wage by the minimum number of business days she

12

was trafficked and applying standard tax rates.  *See* Milbury Report 20.  This equals her requested $24,636.00.  *Id.*  The Court is satisfied with Moen's documentation.

Moen was out of the formal, legal economy for over a year and a half.  *See generally* Compl.  She asserts that she calculated her lost future earning capacity as if she left the workforce to stay at home with a child.  Mem. Supp. Mot. Default J. 12–13.  However, the Court is not convinced that Moen has provided sufficient documentation to support her request.  Her memorandum relies on the Milbury Report and the Center for American Progress calculator.  *Id.* at 12; Milbury Report 8 n.23.  The Milbury Report ultimately relies on the Center for American Progress Calculator to support its calculation of Moen's loss of future income.[7]  Milbury Report 8 n.23.  Although the calculator could be helpful, Moen provides no information as to which inputs were used in the calculator or how Moen determined what each input should be.

Thus, the Court finds that the ITVPA allows Moen to recover lost wages and loss of future earning capacity.  Nevertheless, she has only provided sufficient documentary evidence to support her request for lost wages.  *See id.* at 20.  As such, the Court awards Moen a total of $24,636.00 for economic compensatory damages.

---

[7] Moen's memorandum cites to Schedule 4 and Footnote 28 of the Milbury Report, asserting that it "analogize[s] [her time out of the legal economy] to a woman leaving the workforce to care for a child." *Id.* at 12.  The Court does not see anywhere in the Milbury report that explains the math used to arrive at her requested $64,050.96.  Footnote 28 states: "For the partial years of 2012 and 2014, I allocate a portion of the standard deduction relative to the proportion of time the working period represents.  I apply no other deductions to the earnings."  Milbury Report 9 n.28.  This footnote clearly refers to the calculation of Moen's lost wages, not her loss of future earning capacity.  Schedule 4 too calculates Moen's lost wages and does not mention loss of future earning capacity.  *See id.* at 20–21.
   Footnote 23 of the Milbury Report seems to discuss the information relied upon in the memorandum; however, even Footnote 23 does not explain the calculation process.  *Id.* at 8 n. 23.  Notably, Footnote 23 explicitly states that Milbury is not opining on the dollar amount of Moen's loss of future earning capacity.  And it is at the end of Milbury's discussion of his application of prejudgment interest to Woolridge's unjust gains, not Moen's loss of future earning capacity.  *Id.* at 8.  Moreover, the Footnote itself begins with a reference to Schedules 3a and 3b, which are the detailed calculations Milbury made in order to apply prejudgment interest to Woolridge's unjust gains, and which likewise make no mention of Moen's loss of future earning capacity.  *Id.* at 8 n.23, 18–19.  Finally, Footnote 23 directs the reader to Milbury's "workpapers, tab 'Exit'" for "the inputs used for the calculations" included in the Footnote; however, the Court sees no workpapers or tabs.  *Id.* at 8 n.23.

### 2. Non-Economic Compensatory Damages

A victim under the ITVPA is entitled to compensation for non-economic damages, including "personal injury, disease, and mental and emotional harm," which encompasses "medical, rehabilitation, burial expenses, pain and suffering, and physical impairment." 740 ILCS 128/20(4)(B). Moen requests $25 million in non-economic compensatory damages.

### a. Past and Future Medical Expenses

The ITVPA explicitly allows for recovery of medical expenses. 740 ILCS 128/20(4)(B). Moen requests both past and future medical costs and the Court is satisfied she is statutorily entitled to them. For past medical expenses, Moen requests $5,083.00. Mem. Supp. Mot. Default J. 13. She provides evidence of an injury to her eye and medical records showing treatment for physical and emotional injuries. *See* Moen Decl. ¶ 33, Mem. Supp. Mot. Default J. Ex. B, ECF No. 17-2 ("Once, when we were driving from Pittsburgh to Indianapolis in 2013, [Woolridge] punched me in my left eye. He punched me so hard I couldn't see clearly. I eventually found out his punch had caused a detached retina that I had to have surgery for."); *see also* Med. Records, Moen Decl. Exs. 1 & 4, Mem. Supp. Mot. Default J. Ex. B, ECF Nos. 17-2 at 10–125 & 17-3 at 1–134; Milbury Report 13, 23. The Court is satisfied with this documentation. For future medical expenses, Moen requests $496,824.00 for PTSD treatment. Mem. Supp. Mot. Default J. 13. She provides medical records detailing her treatment for PTSD, *see* Med. Records; calculations for the estimated cost of her future PTSD treatment, *see* Milbury Report 13, 24–25; and a note from a healthcare provider stating that Moen "will require long-term treatment to deal with her symptoms of PTSD" and other emotional injuries, Aug. 19, 2025 Healthcare Letter, Moen Decl. Ex. 5, Mem. Supp. Mot. Default J. Ex. B, ECF No. 17-3 at 136.

14

The Court is satisfied with her documentation.  As such, the Court grants Moen $501,907.00 in medical expenses.

### b.  Other Non-Economic Compensatory Damages

### i.  Statutory Availability

The remaining non-economic compensatory damages Moen requests are, as she recognizes, much harder to quantify.  The Court will first discuss each requested type of non-economic compensatory damages and whether the ITVPA allows for recovery.  Then, the Court will consider what amount to award.

Moen requests the following:

| Pain and suffering | Past | Mental health | $2 million |
|---|---|---|---|
| | | Physical health | $2 million |
| | | Sexual health | $2 million |
| | Future | Mental health | $1 million |
| | | Physical health | $1 million |
| | | Sexual health | $1 million |
| Emotional distress | Past | Mental health | $2 million |
| | | Physical health | $1 million |
| | | Sexual health | $1 million |
| | | Social health | $2 million |
| | Future | Mental health | $1 million |
| | | Physical health | $1 million |
| | | Sexual health | $1 million |
| | | Social health | $1.5 million |
| | | Possible revictimization | $500,000 |
| Loss of normal life | $3 million | | |
| Increased risk of future harm | $3 million | | |

*See* Mem. Supp. Mot. Default J. 28–29.

The ITVPA explicitly allows for recovery of pain and suffering. 740 ILCS 128/20(4)(B). It also allows for recovery of mental and emotional harm, *id.*, which the Court concludes encompasses emotional distress because "emotional distress is a form of suffering and . . . itemizing emotional distress and suffering as separate elements of damages creates a risk of double recovery." *Marxmiller v. Champaign-Urbana Mass Transit Dist.*, 90 N.E.3d 1064, 1066 (Ill. App. Ct. 2017). Moen relies on *Babikian v. Mruz*, 956 N.E.2d 959, 964–65 (Ill. App. Ct. 2011), to support her recovery of both past and future emotional distress damages and past and future pain and suffering damages. *See* Mem. Supp. Mot. Default J. 23–24 (describing *Babikian* as "noting that awarding damages for both does not constitute double recovery"). However, *Babikian* simply states that "there is no indication in the record that the jury was confused in its determination of the appropriate amount of damages for the plaintiff's mental pain and suffering." *Babikian*, 956 N.E.2d at 965. It does not support the proposition that damages for mental pain and suffering are always (or even generally) separate and distinct from past and future emotional distress. Because past and future pain and suffering as well as past and future emotional distress each include recovery for Moen's mental, physical, and sexual health, and Moen discusses her pain and suffering and emotional distress of each type without distinction, *see* Mem. Supp. Mot. Default J. 25–29, the Court declines to consider those subcategories of requested emotional distress damages. The Court will still consider Moen's claims for past and future emotional distress regarding her social health and possible revictimization.

Moen also requests damages for loss of a normal life and increased risk of future harm. Mem. Supp. Mot. Def. J. 29. The ITVPA allows for recovery "not limited to" the listed non-economic categories. 740 ILCS 128/20(4). The Court is satisfied that awarding damages for both of these categories of harm is equitable given the facts presented in this case. *See, e.g.,*

16

*Baker v. Hutson*, 775 N.E.2d 631, 642 (Ill. App. Ct. 2002) (noting that the loss of normal life is a type of compensable damage).  Recovery for loss of normal life is appropriate "where the evidence suggests that the injury has resulted in a diminished ability to engage in the avocations and activities of life, including the inability to pursue pleasurable aspects of life." *Id.*  Increased risk of future harm is also compensable, so long as the plaintiff "has competent evidence which shows that a defendant has negligently caused her to bear the burden of an increased risk of future injury." *Anderson v. Golden*, 664 N.E.2d 1137, 1139 (Ill. App. Ct. 1996); *see also Kamp v. Preis*, 774 N.E.2d 865, 871–72 (Ill. App. Ct. 2002).  And recovering for both increased risk of future harm and possible revictimization is not duplicative—one compensates Moen for the greater risk of harm she faces in the future, and the other compensates her for the emotional impact of that heightened risk of revictimization.

In summary, the Court concludes that the ITVPA allows Moen to recover: past and future pain and suffering for her mental, physical, and sexual health; past and future emotional distress for her social health and future emotional distress for her risk of possible revictimization; loss of normal life; and increased risk of future harm.

### ii.  Appropriate Award

Moen bases her non-economic compensatory damages request on the recommendation of an expert report by Dr. Shobana Powell.  Mem. Supp. Mot. Default J. 24–25; *see also* Powell Rep., Mem. Supp. Mot. Default J. Ex. D, ECF No. 17-5.  Powell states that "[w]hile admittedly it is difficult to put a number on these types of harms, in [her] expert opinion, the value of all of these negative occurrences is no less than $25 million."  Powell Rep. 16.  She does not break the value down into smaller categories.  *See generally id.*  Moen breaks down the $25 million herself and creates an itemized list, but she does not explain why she allocated the amounts as she did.

17

Mem. Supp. Mot. Default J. 28–29.[8]  When adding all of Moen's requested relief except for the categories which the Court finds to be duplicative (*i.e.*, emotional distress damages for mental, physical, and sexual health), she requests $19 million in non-economic compensatory damages, excluding her past and future medical expenses.

Although Moen itemizes her request, the Court declines to do so.  A review of Illinois case law demonstrates that non-economic compensatory damages may be awarded as one amount and not broken down by type.  *See, e.g.*, *Tully v. McLean*, 948 N.E.2d 714, 724 (Ill. App. Ct. 2011) ("The court awarded plaintiffs $1,01,671.96 in compensatory damages . . . ."); *Hampton v. Cagle*, No. 4:20-cv-4210-SLD-JEH, 2024 WL 3967265, at *6 (C.D. Ill. Aug. 28, 2024) (adopting a report and recommendation for "$3,000,000 in compensatory damages" for an Illinois law tort claim).  As such, the Court will consider Moen's $19 million request in its entirety rather than in a piecemeal manner.

Since Moen's non-economic compensatory damages request depends on her own declaration, she "'must explain the circumstances of [her] injury in reasonable detail' and cannot rely on conclusory statements, unless the 'facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action.'"  *Bartuch v. DNI Recovery*, No. 10 C 4869, 2011 WL 689583, at *1 (N.D. Ill. Feb. 16, 2011) (quoting *Wantz v. Experian Info. Sols.*, 386 F.3d 829, 834 (7th Cir. 2004), *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56 (2007)); *Kaiser v. ACCO Mgmt. Co., LLC*, No. 23-CV-1539-JSP, 2026 WL 699601, at *10 (E.D. Wis. Mar. 12, 2026); *see also Crass v. Marval & Assocs. LLC*, No. 10C0058, 2010 WL 2104174, at *1 (E.D.

---

[8] Adding up Moen's itemized requests results in a total of $26 million rather than the $25 million she elsewhere requests.  *Compare* Mem. Supp. Mot. Default J. 31, *and id.* at 28–29.   Nevertheless, as explained herein, the Court finds it unnecessary to identify an amount for each particular type of non-economic compensatory damages, so the Court does not address the more specific itemized requests except insofar as necessary to prevent double recovery.

Wis. May 25, 2010) (finding that the defendant's conduct was insufficiently degrading to support an emotional distress inference and so the plaintiff required evidence to establish her emotional distress).  With this standard of proof in mind, the Court now reviews Moen's non-economic compensatory damages.

The facts of this case are horrifying and Moen suffered significant harm.  Moen "conservative[ly] estimate[s]" that Woolridge forced her to engage in commercial sexual activities almost eight thousand times in just over two years.  Mem. Supp. Mot. Default J. 17.  Before and during those engagements, Woolridge regularly appeared at the hotels, often drunk and with guns and pills in hand.  Moen Decl. ¶ 37.  While there, he would yell and curse at Moen, demanding more money.  *Id.* ¶ 30.  When traveling out of state, Woolridge "often left [her] stranded without money for food or transportation," leaving Moen with "no choice but to turn more tricks just to make money to get home."  *Id.* ¶ 31.

When she began expressing her desire to stop engaging in commercial sexual activities to Woolridge, he threatened her.  *Id.* ¶ 24.  He threatened that "he was 'powerful' and could 'hurt' [her] if [she] disobeyed . . . and he made it seem like he was connected to gangs."  *Id.*  Moen states, "I was scared and needed money, so I did what he told me.  I had sex for money, even though I didn't want to, and gave him part of the money I earned," *id.* ¶ 25, and "I was terrified of him, and I thought that if I tried to escape, he would hurt or kill me," *id.* ¶ 38.  Moen was in a vulnerable state—she truly craved a romantic relationship, and for a long time, she believed herself and Woolridge to be in an actual relationship.  *Id.* ¶ 21.  As a result, Moen now struggles to trust romantic relationships or dating, in constant fear of being lured into another bad situation.  *Id.* ¶¶ 52, 56.  Many of the men with whom Woolridge forced Moen to engage in sexual activities "hurt [her] or used [her] in ways [she] found very painful," including by

19

refusing to wear condoms or removing them without her consent. *Id.* ¶ 43. She describes this time as "three years of hell," stating that "[f]or almost three years, I had lived in constant fear of further arrest, physical harm, sexually transmitted infections, and pregnancy as a result of forced sex." *Id.* In addition to forcing Moen to engage in thousands of instances of commercial sex, Woolridge regularly physically harmed Moen, *see id.* ¶¶ 33–34, and consistently "swore at [her], isolated [her] from friends and family, and forced [her] to give him full access to [her] PayPal account," *id.* ¶ 36.

When Moen stopped sending Woolridge money, he demanded $5,000.00. *Id.* ¶ 44. When she did not send that to him either, he texted and emailed Moen threats of publishing sexually intimate photos. *Id.* ¶ 45. Moen still refused, and Woolridge uploaded sexually explicit photos and videos of her various places, including Pornhub, Facebook, Craigslist, and more. *Id.* ¶ 46. He uploaded these to a Facebook page titled "[Moen's minor child] Needs a Mommy," *id.*, and boasted about doing so, *id.* ¶ 47. It took Moen years to get these videos and photos removed—in fact, they were only removed after a *New York Times* exposé on revenge porn featured her story. *Id.* ¶¶ 60–61.

In her declaration, Moen articulates the actions she suffered with as much clarity as can be expected from an individual already dealing with homelessness, unemployment, and single motherhood, who was then forced to engage in at least fifty instances of unwanted sex weekly for over two years. She also clearly states the toll Woolridge's action took on her physically, mentally, emotionally, socially, and sexually. *See, e.g.*, *Kaiser*, 2026 WL 699601, at *10 (finding that the facts within the plaintiff's sworn affidavit were "sufficiently detailed, together with the underlying facts of the case, such that [the court] can determine [her] award of emotional damages therefrom"). These clear articulations include:

- "These non-consensual postings, combined with everything I had already lived through, have caused me severe emotional distress and ongoing post-traumatic stress disorder." Moen Decl. ¶ 48.

- "When I first realized I had been trafficked, I thought about killing myself." *Id.* ¶ 51.

- "I now avoid certain places, people, and situations that remind me of my trafficking, like crowds and dating." *Id.* ¶ 52.

- "I suffered—and, without medication, still suffer—from recurring nightmares of sexual abuse and themes from my trafficking. These nightmares are controlled only because I take medicine for them." *Id.* ¶ 50.

- "I also constantly worry about what is being said about me and who might want to hurt me next." *Id.* ¶ 53.

- "I also frequently feel overwhelmed and anxious in everyday situations." *Id.* ¶ 54.

- "I regularly experience urges to run away from my life." *Id.* ¶ 57.

- "I no longer enjoy dating or intimate relationships. Having to explain my past to intimate partners causes me a lot of stress and anxiety." *Id.* ¶ 58.

- "In addition to being treated for PTSD, I am getting medical treatment for anxiety and depression because of what [Woolridge] did. I take prescription medications that I wouldn't need if it weren't for my trauma. These medications help me live as close to a normal life as possible." *Id.* ¶ 63.

- "There is really nothing that would ever make me feel whole again. Nothing that happened to me can be undone. What happened to me was real and, because of it, I will never life a normal life again." *Id.* ¶¶ 69–70.

21

These sentiments are supported by both Powell's report, *see generally* Powell Rep., and the submitted medical documentation, *see generally* Med. Records.

Moen argues her damages request is "appropriate under the circumstances" and is "neither unfair nor unreasonable, nor does it shock the judicial conscience." Mem. Supp. Default J. 25. She further asserts that "under Illinois law, it's neither necessary nor appropriate to evaluate a [fact-finder's] compensatory award against awards in similar cases; a comparative analysis is not part of the state framework." *Id.* (quotation marks omitted) (alteration in original). She relies on *Rainey v. Taylor*, 941 F.3d 243, 253 (7th Cir. 2019), to support this assertion; however, *Rainey* discusses the standard for reviewing a federal jury's award of compensatory damages under Illinois law, not the standard for awarding compensatory damages under Illinois law in federal court at the default judgment stage. The Court will review some comparator case law to serve as a guidepost, not a limitation, on non-economic compensatory damages in Illinois.

There are not many analogous cases with public damage award amounts; however, the Court finds four cases particularly illustrative. In *Hampton v. Cagle*, the plaintiff, one month post-partum, was an arrestee being transported under court order when the individual transporting her "followed her into the bathroom [at a roadside rest stop], wherein he battered, sexually assaulted, and raped her." *Hampton*, 2024 WL 3967265, at *1. The court awarded the plaintiff with $3 million in compensatory damages for negligence under Illinois tort law and violations of the United States Constitution. *Id.* at *6. In *J.K.J. v. Polk County*, 960 F.3d 367, 371 (7th Cir. 2020), the plaintiffs, two incarcerated women, were repeatedly sexually assaulted by the same correctional officer over three years. The Seventh Circuit upheld an award of $2

22

million in compensatory damages and $3.75 million in punitive damages for each plaintiff under § 1983 and state negligence law.[9]  *Id.* at 375, 386.

Although Moen and the other plaintiffs all bring claims of egregious conduct, Moen's case is unique in that it involves at least ten instances per day, every day, for years.  The plaintiffs in *J.K.J.* were similarly assaulted repeatedly over the course of three years; however, the record does not indicate that they were assaulted between fifty and seventy times each week for that three-year period.  *Id.* at 370–71.  The *Hampton* plaintiff experienced one instance of sexual assault and rape, *Hampton*, 2024 WL 3967265, at *1—Moen experienced thousands.  Like the plaintiff in *Hampton*, Moen suffered serious physical injuries from Woolridge's conduct, Moen Decl. ¶ 33; however, the *Hampton* plaintiff faced one instance of battery, *Hampton*, 2024 WL 3967265, at *1—Moen faced countless.  *J.K.J.* also makes no mention of social ramifications faced by Moen—it does not discuss the loss of many friendships, strained relationship with a child, or inability to pursue romantic relationships as a result of the defendants' actions.  *See generally J.K.J.*, 960 F.3d 367.  The plaintiff in *Hampton* did "struggle[] to connect with others, including her children," but there is no evidence that the extent of her social and relational suffering was as great as Moen's.  *See Hampton v. Cagle*, No. 4:20-cv-04210-SLD-JEH, 2024 WL 4235164 (C.D. Ill. June 27, 2024) [Hampton R. & R.]; *see generally Hampton*, 2024 WL 3967265 (adopting R. & R.).  None of the plaintiffs testified to fearing for their lives or facing serious threats of physical harm.  *See generally J.K.J.*, 960 F.3d 367; *see generally Hampton*, 2024 WL 3967265.  None of the plaintiffs were blackmailed for thousands of dollars by the defendants or were subjected to several instances of nonconsensual

---

[9] Although this case discusses violations of federal and Wisconsin state law, the Court finds it helpful in that it serves as a useful comparator—the defendant's conduct resembles that of Woolridge's.

publication of sexually-explicit content, including one that named their minor children.  *See generally J.K.J.*, 960 F.3d 367; *see generally Hampton*, 2024 WL 3967265.

Also helpful guideposts are two cases which consider compensatory and punitive damage awards under TVPRA's predecessor, the Trafficking Victims Protection Act of 2000: *Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867 (E.D. Va. Sept. 4, 2012), and *Moore v. Rubin*, 724 F. Supp. 3d 93 (E.D.N.Y. 2024).  These cases consider comparable conduct, but with a significantly lower frequency.  In *Doe v. Howard*, the defendants forced the plaintiff into international forced servitude and sexual servitude.  *Howard*, 2012 WL 3834867, at *1.  The defendants "controlled all aspects" of the plaintiff's life; she worked as a house cleaner for the defendants for many as ninety hours a week with no days off, was denied medical care, and ultimately escaped from the defendants.  *Id.* at *4.  Even upon escape, she "[wa]s constantly frightened of others" and "believe[d] it w[ould] be nearly impossible to trust anyone again."  *Id.* Similarly, Woolridge exerted significant control over Moen's life, even going so far as monitoring her PayPal and email accounts, and forced her to work every day.  Moen Decl. ¶¶ 32, 36.  And Moen too fears other people and struggles to trust.  *Id.* ¶¶ 52, 56.  The *Howard* plaintiff was also forced into sexual servitude for the defendant-husband—he "raped [her] four times, forced her to perform oral sex on him approximately ten times, and sexually assaulted her." *Howard*, 2012 WL 3834867, at *2.  Because of this and his repeated sexual comments, the plaintiff "suffered from anxiety attacks, depression, insomnia, an inability to concentrate or complete tasks, and traumatic distress," and her marriage and sexual relationship with her husband became "damaged."  *Id.* at *3.  Moen was similarly sexually assaulted, raped, and forced to engage in repeated, unwanted sexual activity; however, Woolridge forced her to engage in thousands of instances of unwanted sexual activities, *see* Milbury Report 14–17, far more than

24

the *Howard* plaintiff's roughly fifteen instances.  The *Howard* plaintiff received $1,294,500.00 in compensatory damages for this conduct.  *Howard*, 2012 WL 3834967, at *3–4.  Moen is entitled to significantly higher damages relative to the *Howard* plaintiff because she experienced controlling behavior and forced labor like that of the *Howard* defendants; identified similar ongoing emotional ramifications, as well as several others; and suffered *at least* 5,000 more instances of forced sexual activities, *see* Milbury Report 14.

In *Moore*, six plaintiffs brought claims against one man, who contracted with them to travel to New York and perform sadomasochistic sexual acts.  *Moore*, 724 F. Supp. 3d at 97. Each plaintiff had one violent encounter with the defendant and received $500,000.00 in compensatory damages.  *Id.* at 98.  "There were two components to the jury's compensatory damages award here: first, the pain and suffering resulting from the actual physical abuse to which [the defendant] subjected plaintiffs . . . and, second, emotional and psychological injuries . . . ."  *Id.* at 105.  Like the harms suffered by the plaintiffs in *Moore*, Moen's detached retina is a very serious and painful injury.  *Id.*  And the extensive emotional and psychological toll Moen suffered is, except for relapse into drug use, substantially similar to the list of all the six *Moore* plaintiffs' injuries: "anxiety, PTSD; difficulty sleeping; therapy; suicide attempt; loss of intimacy and sexual desire; difficulty bonding with children; distrust of family; [and] relapse into drug use."  *Id.*  That Moen's individual injuries are comparable to a list of injuries compiled by six plaintiffs, in conjunction with Moen's *minimum* 5,500 instances of forced sexual activity, *see* Milbury Report 14, relative to each *Moore* plaintiff's one violent encounter with the defendant, supports granting Moen a significantly higher compensatory damages award.

In conclusion, given the scale of the damages awards in cases featuring fewer or less frequent harms, Moen's request for $19 million is consistent with prior cases.  The Court is

25

satisfied with Moen's declaration and its powerful description of the harms suffered, including serious emotional distress, pain and suffering, loss of normal life, and risk of future harm. As such Moen is granted $19 million for non-economic, non-medical compensatory damages, plus $501,907.00 in medical expenses, for a total of $19,501,907.00 in non-economic compensatory damages.

### iii. Punitive Damages

A victim under the ITVPA is entitled to punitive damages. 740 ILCS 128/20(5). "The focus of punitive damages is not on the position of the party wronged, but the position of the party committing the wrong." *Franz v. Calaco Dev. Corp.*, 818 N.E.2d 357, 369 (Ill. App. Ct. 2004). As such, punitive damages "actually improve the position of the complaining party, while all other damages simply return the plaintiff to the position [s]he held before the wrong" *Id.* In Illinois, punitive damages must comport with both Illinois common law and federal due process guidelines. *See Blount v. Stroud*, 915 N.E.2d 925, 939 (Ill. App. Ct. 2009) ("The Illinois common law punitive damages inquiry is distinct from the constitutional challenge."). Moen requests a punitive damages to compensatory damages ratio within the range of 3:1 to 6:1. Mem. Supp. Mot. Default J. 30.

### 1. Illinois Common Law

Under Illinois law, a judge may issue punitive damages and assess the amount to award. *Franz*, 818 N.E.2d at 368. "[E]ach case must be assessed in light of the specific facts and circumstances involved, and the underlying purpose of a punitive damage award must be satisfied." *Blount*, 915 N.E.2d at 939. "[U]nder the Illinois common law analysis, there is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery." *Id.* at 940. It is somewhat

unclear exactly what factors courts should consider when issuing punitive damages; however, the steps for appellate review of a bench trial's award of punitive damages are well-established: (1) "[w]hether punitive damages are available as a matter of law for the cause of action"; (2) "[w]hether the facts prove willfulness or other aggravating factors"; (3) "[w]hether punitive damages should be awarded"; and (4) "[t]he computation of the punitive damages award," which is reviewed "by looking at whether the amount was excessive or the result of passion, partiality, or corruption." *Franz*, 818 N.E.2d at 366–67 (internal citations omitted). "The amount of an award should be a reflection of the fact finder's determination as to the degree of maliciousness evinced by a . . . defendant's actions" and the "fact finder must also evaluate evidence of the defendant's financial worth, if presented." *Id.* at 372 (internal citations omitted). The Court will follow this process to determine whether to award punitive damages and, if so, impose an appropriate punitive damages award under Illinois common law.

In this case, punitive damages are available as a matter of law. 740 ILCS 128/20(5). The facts certainly prove willfulness—no reading of the facts alleged in Moen's complaint supports a finding that Woolridge did not act knowingly and intentionally. And, as discussed, the nature and enormity of Woolridge's conduct cannot be overstated. *See supra* Section II(b)(ii)(2). Thus, the determination of whether to award punitive damages is discretionary. *See, e.g.*, *Franz*, 818 N.E.2d at 375 (reviewing a trial court's exercise of discretion in not awarding punitive damages when willfulness and availability of punitive damages both existed). Because of the willfulness and severity of Woolridge's conduct, the Court finds that punitive damages should be awarded in this case.

Moen was awarded a total of $19,526,543.00 in compensatory damages; therefore, her minimum requested punitive damages would total $58,579,629.00 (applying her requested 3:1

ratio).  *See* Mem. Supp. Mot. Default J. 30.  Thousands of forced sexual activities, years of profiting from those forced sexual activities, years of threats, years of verbal abuse, and other intentional actions demonstrate that Woolridge acted with the highest possible "degree of maliciousness." *Franz*, 818 N.E.2d at 372.  The Court has no information about Woolridge's financial status besides Moen's belief that he is a music producer.  Moen Decl. ¶ 8.  This does not prevent the Court from awarding punitive damages, however, because "[e]vidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge or jury in determining an appropriate award of punitive damages." *Deal v. Byford*, 537 N.E.2d 267, 272 (Ill. 1989).  And, as already established, Woolridge is liable under the ITVPA for his conduct.  *See supra* Section II(a)(ii).  Under the considerations of Illinois common law, the Court has no concerns with Moen's requested punitive damages.  However, the award must be lowered to comport with federal due process.

### 2.  Federal Due Process

"[T]he due process clause of the fourteenth amendment prohibits a state from imposing a grossly excessive punishment on a tortfeasor." *Doe v. Parrillo*, 185 N.E.3d 1248, 1261 (Ill. 2021) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996)).  The Supreme Court has provided three guideposts for determining whether a punitive damages amount is grossly excessive: "(1) the 'degree of reprehensibility' of the defendant's conduct, (2) the 'disparity between the harm or potential harm' suffered by the plaintiff and the amount of punitive damages, and (3) 'the differences between this remedy of punitive damages and the civil penalties authorized or imposed in comparable cases.'" *Id.* (alteration omitted) (quoting *Gore*, 517 U.S. at 574–75).

28

### a.  Reprehensibility

Reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award."  *Gore*, 517 U.S. at 575.  Woolridge's conduct was certainly "egregiously reprehensible."  *See Parrillo*, 185 N.E.3d at 1263–64 (finding that intentional threats of and commission of violent acts and one sexual assault constituted "egregiously reprehensible" conduct).  When considering reprehensibility, the Supreme Court requires courts to assess whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

In this case, the harm Woolridge inflicted on Moen was both physical and economic. Among other economic harms, Woolridge removed Moen from the legal workforce for several years, *see generally* Compl., and withheld significant portions of her earnings, *see, e.g.*, *id.* ¶ 2. "Acts of violence or threats of bodily harm [are] the most reprehensible" based on the Supreme Court's hierarchy of reprehensibility.  *Florez v. Delbovo*, 939 F. Supp. 1341, 1347–48 (N.D. Ill. 1996); *see also Blount*, 915 N.E.2d at 942 ("[T]hreats of physical violence are regarded as more reprehensible than nonviolent conduct . . . .").  And Woolridge certainly inflicted physical harm—he forced Moen into sexual commercial activities, including repeated rape and assault, Moen Decl. ¶ 43, and beat her, causing injuries that required surgery, *id.* ¶ 33.

Woolridge's conduct certainly demonstrated an intentional disregard for Moen's health and safety.  From leaving her stranded out-of-state without any money, *id.* ¶ 32; to forcing her to meet with dozens of men a week in hotel rooms and not allowing her to stop when she wanted to,

29

*id.* ¶¶ 26–28; to beating her, *see, e.g.*, *id.* ¶¶ 34–35; Moen depicts Woolridge's complete and intentional disregard for her wellbeing.

Moreover, Moen had significant financial vulnerability at the time. She was a single mother, struggling with homeless and unemployment, and grappling with the recent loss of a mother. Compl. ¶ 12; *Blount*, 915 N.E.3d at 942 ("Courts have recognized single mothers . . . to be financially vulnerable."). Woolridge knew this.

Woolridge's conduct was also clearly repeated. At a minimum, Moen was forced to engage in over 5,500 instances of unwanted commercial sexual activities. *See* Milbury Report 14. Woolridge's controlling and violent behavior occurred regularly, from appearing at her hotels with guns and pills, Compl. ¶ 38; to monitoring her PayPal activity, *id.* ¶ 37; to berating her in hotel lobbies while waiting for clients, *id.* ¶ 29. Woolridge's threats also persisted even once Moen escaped. *Id.* ¶¶ 42–45.

There is no doubt that the harm Moen has suffered is a direct result of Woolridge's intentional conduct. He was the one to suggest Moen create a Backpage account, *id.* ¶ 14; he took photos for and established her Backpage account, *id.* ¶¶ 18–19; he scheduled her client meetings and instructed her on how to speak with the clients, *id.* ¶¶ 21–23; he forced her to continue despite her expressed discomfort, *id.* ¶ 26; he sat in the hotel lobbies where she stayed before and during her engagements, *id.* ¶ 29; he threatened and intimidated her, *see, e.g.*, *id.* ¶ 37; he drove her to other cities for more business, *id.* ¶¶ 30–31; and, each time, he took a significant percentage of her earnings, *see, e.g.*, *id.* ¶ 24. When a defendant "deliberate[ly] attempt[s] to harm another person," the punitive damages are much higher than when the harm was recklessly caused. *Slovinski v. Elliot*, 927 N.E.2d 1221, 1228 (Ill. 2010). Clearly, Woolridge deliberately attempted to harm Moen.

30

In sum, Woolridge's conduct is among the most reprehensible possible.  He inflicted significant physical and economic harm upon Moen, demonstrated an intentional disregard for her health and safety, knew she had significant financial vulnerabilities, and both repeatedly and intentionally engaged in said harmful conduct.

### b.  Ratio

The disparity between harm and monetary amount, commonly referred to as the "ratio," is not subject to any sort of categorical approach—the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." *Gore*, 517 U.S. at 582; *see also Int'l Union of Operating Eng'rs, Local 150 v. Lowe Excavating Co.*, 870 N.E.2d 303, 320–21 (Ill. 2006).  "When the ratio is a breathtaking 500 to 1, however, the award must surely raise a suspicious judicial eyebrow." *Gore*, 517 U.S. at 583 (quotation marks omitted).  Double, treble, and quadruple damage ratios are "instructive" because "[t]hey demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Campbell*, 538 U.S. at 425.  "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

Moen's requested ratio range of 3:1 to 6:1 is not per se unconstitutional.  *See Parrillo*, 185 N.E.3d at 1264 (upholding an 8:1 ratio as constitutional under federal due process).  Nevertheless, determination of an appropriate ratio requires consideration of the resulting dollar amount, not just the ratio numbers.  *See, e.g.*, *Blount*, 915 N.E.2d at 945–46 (determining that a punitive damages award comports with federal due process when considering the final dollar amount); *Parrillo*, 185 N.E.3d at 1265 ("Based on the facts and circumstances of [the defendant's] egregiously reprehensible conduct that directly resulted in repeated personal,

31

physical, and emotional harm to [the plaintiff], we cannot say that $8 million in punitive damages was so unreasonable as to violate [federal] due process."). The compensatory damages award in this case—over $19.5 million—is quite high. A 3:1 ratio would require Woolridge, just one person, to pay roughly $60 million in punitive damages, before adding in the other categories of damages he owes. Because the Court "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered," *Campbell*, 538 U.S. at 426, and Moen is already recovering a significant amount of damages, due process requires a lower ratio. Although the Court is convinced that Moen is entitled to more than a 1:1 ratio, *cf. id.* at 425–26 (noting that a lower punitive damages ratio was appropriate because, among other things, the plaintiffs suffered economic harm rather than physical assault or trauma), $60 million (arising out of a 3:1 punitive damages ratio) would be a grossly excessive punitive damages award and fail to comport with due process requirements. As such, the Court applies a 1.5:1 ratio, equaling $29,289,814.50.

### c. Comparable Misconduct

Comparable misconduct includes civil and criminal penalties. *Gore*, 517 U.S. at 538. However, "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." *Campbell*, 538 U.S. at 428. In this case, Woolridge's conduct could have exposed him to criminal liability.[10] 720 ILCS 5/10-9; *see also* 18 U.S.C. § 1591 (criminalizing the conduct for which the TVPRA provides a private right of action). This shows that Illinois takes his conduct and these harms seriously. *Parrillo*, 185 N.E.3d at 1264–65 (noting that a criminal sanction "show[s] that the State takes [this conduct] seriously"). The *Parrillo* court upheld a jury's

---

[10] There is no indication in the record as to whether Woolridge was ever prosecuted for his conduct with and towards Moen.

punitive damages award of $8 million, *id.* at 1265, but Woolridge's conduct is far more egregious than that of the *Parrillo* defendant. That defendant committed several instances of domestic battery, including hitting the plaintiff in the head with a glass coffee maker and strangling her, as well as once sexually assaulting and raping her. *Id.* at 1250–51. Woolridge too forced Moen to be raped, but on the thousands. Woolridge too physically harmed Moen, causing retinal damage among other injuries. And not only did Woolridge commit these acts, but he also reaped significant financial benefits from forcing Moen to engage in commercial sexual acts. Furthermore, Woolridge published sexually explicit photos and videos of Moen without her consent. For all of these reasons, the Court finds that Moen is reasonably entitled to greater punitive damages than the plaintiff in *Parrillo*.

Moen provides sparse examples of comparable misconduct. *See* Mem. Supp. Mot. Default J. 29–30. Thus, the Court again considers *Howard* and *Moore*. The *Howard* court upheld a $2 million punitive damages award because of the defendants' "intentional egregious and outrageous conduct, and the fact that [the plaintiff] continues to live in a constant state of terror." *Howard*, 2012 WL 3834867, at *5. Of significance to the court was that the plaintiff suffered fourteen instances of sexual assault and that one of the defendants "traveled more than 8,000 miles" to track down the plaintiff. *Id.* Although Woolridge did not cross continents to hunt Moen down, he continued to reach out to her even after she finally escaped from him. Moen Decl. ¶¶ 42–46. And Moen suffered fourteen instances of forced sexual acts *every two days*. *Id.* ¶ 27 (describing fifty to seventy instances of commercial sex per week). This certainly justifies a higher punitive damages award, as it did the compensatory damages award. The jury in *Moore* awarded five of the plaintiffs with $120,000.00 and the sixth plaintiff with $250,000.00 in punitive damages. *Moore*, 724 F. Supp. 3d at 98. As with *Howard*, the monumental

difference in frequency of forced sexual activity (one encounter per *Moore* plaintiff versus ten to twelve encounters daily for Moen) justifies Moen's comparatively substantial punitive award.

While the Court recognizes that $29,289,814.50 is a significant monetary award, it finds that this is proportionate with the reprehensibility of Woolridge's conduct; his comparable misconduct; and, at a 1.5:1 ratio with Moen's compensatory damages, is not "grossly disproportionate." *See, e.g.*, *Doe v. Fritch*, 239 N.E.3d 1259, 1274–75 (Ill. App. Ct. 2024) (finding that a 1:1 ratio of punitive and compensatory damages was not grossly disproportionate under federal due process because of the reprehensibility of the defendant's conduct).

### iv.   Attorneys' Fees and Costs

A victim under the ITVPA is entitled to attorneys' fees and costs, including expert testimony expenses and witness fees. 740 ILCS 128/20(3). The Court is satisfied that Moen is entitled to attorneys' fees and costs. Moen asserts that, when the case is ready to close, "counsel . . . are prepared to submit a supplemental Memorandum in Support of Costs and Attorneys' Fees . . . complete with affidavits and sufficient evidence of costs and reasonable fees for the attorneys and paralegals who have worked on this case." Mem. Supp. Mot. Default J. 30–31. Because attorneys' fees and costs can be awarded after the close of a case, the Court will close this case and enter judgment. Moen will have fourteen days to file the relevant brief and evidence. *See* Civil LR 54.1.

### v.   Pre- and Post-Judgment Interest

Finally, the Court addresses whether Moen is entitled to pre- and post-judgment interest. While pre-judgment interest is a matter of state law, post-judgment interest is a matter of federal law. *See Fed. Deposit Ins. v. Chi. Title Ins.*, 12 F.4th 676, 686 n.8 (7th Cir. 2021) ("When exercising diversity jurisdiction or supplemental jurisdiction over state-law claims, of course,

federal courts routinely look to state law to determine whether prejudgment interest is appropriate and if so, at what rates and for what time."); 28 U.S.C. § 1961(a) (allowing post-judgment interest "on any money judgment in a civil case recovered in a district court"). The ITVPA recovery statute does not mention pre-judgment interest. *See* 740 ILCS 128/20. However, as Moen points out, Mem. Supp. Mot. Default J. 22, the statute does state that victims "shall be entitled to all relief that would make . . . her whole," and specifies that the listed categories of relief are non-exhaustive, 740 ILCS 128/20. Under Illinois law, plaintiffs bringing a successful action and recovering damages for personal injury "resulting from or occasioned by the conduct of any other person," including by intentional conduct, are entitled to prejudgment interest. 735 ILCS 5/2-1303(c). Moen's ITVPA claim is a personal injury claim to which the Court will apply Illinois's prejudgment interest statute. Prejudgment interest is awarded at a rate of six percent per annum on the total judgment amount, excepting any punitive damages, sanctions, and statutory attorneys' fees and costs. *Id.* Accrual begins on the date the action was filed, *id.*—in this case, February 24, 2025, Compl. 1, and ends upon entry of judgment, 735 ILCS 5/2-1303(c).

The Court is satisfied that Moen is entitled to prejudgment interest; however, the Court declines to adopt the prejudgment interest dollar amount and formula Moen recommends for several reasons. *See* Milbury Report 26–27. First, Moen only applies the prejudgment interest to Woolridge's unjust gains and Moen's lost wages when, according to Illinois law, prejudgment interest applies to the total of her award, excluding punitive damages and attorneys' fees and costs. This includes far more than just Woolridge's gains and her own lost wages. And second, Moen calculates the prejudgment interest as accruing from the date of her sex trafficking and

ending at the time of filing her claim, *see id.*; however, as discussed above, accrual spans from February 24, 2025, the date of filing, until this Court enters judgment.

Because this order enters judgment and closes the case, it is appropriate to now calculate Moen's prejudgment interest. Moen is entitled to prejudgment interest on $19,696,043.00 (the sum of her gross revenue and compensatory damages awards). Although the Court declines to use the exact calculation process relied upon by Milbury, it does use a prejudgment interest formula he describes: *Prejudgment Interest = Principal x Interest Rate x Term.*[11]  *See, e.g., id.* at 26 n.1 (outlining a simple interest formula). It has been 518 days since February 24, 2025 (the date Moen filed her complaint), or 1.419 years (518 days divided by 365). As such, Moen is entitled to $1,677,131.55 in prejudgment interest.

A party recovering "any money judgment in a civil case . . . in a district court" shall be entitled to post-judgment interest. 28 U.S.C. § 1961(a). Post-judgment interest "shall be calculated from the date of entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." *Id.* The weekly average 1-year constant maturity Treasury yield for the week preceding this judgment is 4.10 percent. *See* Market Yield on U.S. Treasury Securities at 1-Year Constant Maturity, Quoted on an Investment Basis (WGS1YR), *Fed. Rsrv. Bank of St. Louis*, https://fred.stlouisfed.org/series/WGS1YR (last visited July 27, 2026). This interest shall be computed daily and compounded annually. *Id.* § 1961(b). Because Moen is recovering a money judgment in a civil case in district court, the Court is satisfied that she is entitled to post-judgment interest at a rate of 4.10 percent under federal law, accruing from the date this Court enters judgment until Woolridge satisfies the award.

---

[11] Moen's formula makes clear that she only requests simple prejudgment interest. As such, the Court does not address whether awarding compound interest would be appropriate.

**CONCLUSION**

Accordingly, Plaintiff Adriane Moen's motion for default judgment, ECF No. 16, is GRANTED IN PART and DENIED IN PART.  Defendant John Woolridge is liable for sex trafficking under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591(a); 18 U.S.C. § 1595, and the Illinois Trafficking Victims Protection Act, 740 ILCS 128/15.  The Court awards Moen $169,500.00 in gross revenue damages, $24,636.00 in economic compensatory damages, and $19,501,907.00 in non-economic compensatory damages, plus $1,677,131.55 in prejudgment interest.  The Court also awards Moen $29,289,814.50 in punitive damages and finds she is entitled to attorneys' fees and costs, plus the costs of expert and witness testimony.  Moen is also entitled to post-judgment interest on her entire award at a rate of 4.10 percent with accrual beginning on the date of judgment and continuing until the award is satisfied.

Moen is DIRECTED to file a brief detailing the attorney, expert, and witness fees and costs incurred litigating this case, as well as supporting evidence, by August 10, 2026.  Defendant John Woolridge can file a response addressing only the amount of the requested fees by August 24, 2026.  The Clerk is directed to enter judgment and close the case.

Entered this 27th day of July, 2026.

s/ Sara Darrow

SARA DARROW
UNITED STATES DISTRICT JUDGE
